IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MANUEL MATOS | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-2648 |
| | : | |
| MERCK & COMPANY, INC. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                 **March 3, 2015**

Plaintiff Manuel Matos brings this employment discrimination action against Merck & Company, Inc. (Merck), his former employer, pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 1981, the Americans with Disabilities Act (ADA), and the Pennsylvania Human Relations Act (PHRA).[1] Matos, who was born in Puerto Rico, worked for Merck from May 1999 until October 2008, when he resigned from the company while on stress-related short-term disability leave and went to work for another pharmaceutical company. In 2009 and 2010, Matos sought to return to Merck, but the company declined to rehire him. Matos alleges Merck discriminated against him based on his race, national origin, and/or disability, and retaliated against him for taking disability leave, when the company failed to rehire him. Merck has filed a motion for summary judgment as to all claims. For the reasons set forth below, the motion will be granted.

## FACTS[2]

From May 1999 until he resigned in October 2008, Matos worked for Merck in the company's facility in West Point, Pennsylvania, a vast complex consisting of dozens of

---

[1] Title VII, the ADA, and the PHRA are codified at 42 U.S.C. § 2000e et seq., 42 U.S.C. § 12101 et seq., and 42 Pa. Stat. § 951 et seq., respectively.

[2] The following facts are drawn from the evidence in the summary judgment record, which the Court must view in the light most favorable to Matos, drawing all reasonable inference in his favor. *See Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

buildings.  *See* Pl.'s Ex. B (hereinafter "Matos Dep.") 15, Feb. 11, 2014.  From the time he was hired until September 2007, Matos worked in a series of union positions as a plumber/pipefitter.

In September 2007, Matos applied for two different supervisory positions:  a vaccine packaging supervisor position in Department 290, for which the hiring manager was Michael McGinn, and a vaccine manufacturing supervisor position in Department 135, for which the hiring manager was Timothy Cooper.  After interviewing Matos, who had been recommended by his prior managers and supervisors, McGinn offered him the supervisory position in Department 290.  In his September 20, 2007, offer letter, McGinn stated the position was a second shift (i.e., evening) position, Thursday through Monday, with a start date of September 24, 2007, and an annual salary of $67,794 "plus applicable shift premium."  Pl.'s Ex. K.  Although the offer letter did not specify the applicable shift premium, McGinn told Matos the premium would be $900 per month.  Matos Dep. 41; *see also* Pl.'s Ex. H.  According to Matos, he did not interview for the position in Department 135.[3]

Prior to accepting the position in Department 290, Matos discussed with Thomas Hannan, his supervisor for the six to twelve months immediately prior to his promotion, some of the pros and cons of moving into management.  Hannan cautioned Matos that when Hannan had moved into management, his pay dropped initially.  *See* Pl.'s Ex. D (hereinafter "Hannan Dep.") 15-16, Mar. 14, 2014.  Some of Matos's coworkers counseled him against going into management, warning, "they [i.e., management] eat their own."  Matos Dep. 72-73.  In addition, union officials advised Matos that once he made the transition to management, he would not be able "to come back as a pipefitter" and would lose all of his seniority with the union.  *Id.* at 82, 84.

---

[3] Cooper disagrees, asserting he interviewed Matos for the Department 135 position.  Def.'s Ex. 5 (hereinafter "Cooper Decl.") ¶ 8.  As noted, the Court accepts Matos's version of the facts as true in evaluating Merck's summary judgment motion.

When Matos reported for his first day of work in Department 290, McGinn told him he should report instead to Department 135, which "need[ed] people." *See id.* at 48-49.[4]  Matos did not object to the change because McGinn told him the compensation for the Department 135 position—for which he had also applied—would be the same as for the position in Department 290.[5]  Matos Dep. 56-57.  Rather, Matos reported to Cooper in Department 135, as directed.

---

[4] The scant evidence in the record as to the reason for Matos's reassignment suggests Matos was given the position in Department 135 because that department had the greater business need.  In his deposition, Matos acknowledged McGinn told him the reason for the reassignment was "probably business unit needs."  Matos Dep. 56.  Likewise, in an internal email written months after the reassignment, McGinn stated Matos had been given the Department 135 position instead of the Department 290 position for which he had originally been hired because Department 135 "represented the greater business need."  Pl.'s Ex. H.

[5] In fact, McGinn's representation was incorrect, as the shift premium for the Department 135 position turned out to be $360, rather than the $900 McGinn had promised for the Department 290 position.  *See* Matos Dep. 58.  A few months into his new position, Matos raised an issue regarding his compensation with Cooper, who referred Matos to the human resources (HR) department.  *See* Pl.'s Ex. A (hereinafter "Matos Statement") ¶ 6.  An HR representative advised Matos he was entering the pay code incorrectly, but Matos was unable to correct the problem using the different pay codes the representative gave him.  *See id.* ¶ 7; Matos Dep. 90.  Eventually, Matos contacted the payroll department directly and was told he was not receiving the $900 shift premium because Cooper had not approved it.  *See* Matos Dep. 90.  Matos confronted Cooper, who told him Department 135 did not pay "that kind of shift differential." *Id.*; Matos Statement ¶ 8.  When Matos complained that he never would have accepted a supervisory position had he known he would earn less than he earned as a pipefitter, Cooper responded, "I didn't hire you," which Matos understood to mean that the pay issue was not Cooper's problem.  Matos Statement ¶¶ 9-10; Matos Dep. 90.  Although Matos had pursued the pay issue with the HR and payroll departments, he did not file a formal grievance about the issue because he feared losing his job.  *See* Matos Dep. 188-89.  Matos later mentioned the disparity to McGinn, who told Matos he had assumed Department 135 paid the same as Department 290. *See* Matos Statement ¶ 11.
    According to Merck policy, the $360 shift premium Matos received is the company's standard shift premium for regular second shift work.  *See* Def.'s Reply Ex. 2.  Moreover, there is no evidence any other supervisor working the second shift in Department 135 earned more.  Nevertheless, Matos asserts Merck's failure to honor McGinn's promise of a $900 shift premium was discriminatory, noting that Merck corrected a similar mistake for Thomas Guellich, a white manager, at some unspecified time in the past.  In Guellich's case, an HR representative quoted Guellich a salary for a position, but after accepting the position, he received a paycheck for a lesser amount.  *See* Pl.'s Ex. C (hereinafter "Guellich Dep.") 61, Mar. 17, 2014.  After Guellich

During his tenure in Department 135, Matos held the position of second shift Vial Filling

Line (VFL) supervisor, in which he supervised production of Merck's Gardasil vaccine.  By all

accounts, the position was a challenging one.  *See* Matos Statement ¶ 16; Cooper Decl. ¶ 10.[6]

Upon joining Department 135, Matos spent approximately eight to ten weeks training before

beginning to work independently as a VFL supervisor.  *See* Cooper Decl. ¶¶ 12, 15; Matos Dep.

55, 95.  Matos initially trained on the first shift with Francisco Saenz, who was on loan from

Merck's Puerto Rico facility,[7] and Keith Hoffman, the first split shift supervisor.  Cooper Decl.

¶ 12; *see also* Matos Dep. 49-52, 94.[8]

Matos maintains the training he received was wholly inadequate and asserts Saenz lacked

the knowledge necessary to properly train him.  *See* Matos Dep. 50 (characterizing Saenz's

---

elevated the issue to a vice president with whom he was friendly, Merck honored the promised salary.  *See id.* at 61-62.

[6] In his opposition to Merck's summary judgment motion, Matos argues the Court should strike Cooper's declaration because it was not made under penalty of perjury pursuant to 28 U.S.C. § 1746 and Cooper's statements are therefore not in a form that would be admissible in evidence. Because Merck has cured this defect by submitting a supplemental declaration from Cooper, in which he "reaffirm[s] and declare[s] that [he] made and now again make[s] each of the assertions of facts set forth in [his original declaration] . . . subject to and under the penalties of perjury," Def.'s Reply Ex. 1 ¶ 3, the Court declines to strike the declaration from the summary judgment record.  *See* Fed. R. Civ. P. 56(e)(1) (providing that if a party "fails to properly support an assertion of fact . . . , the court may . . . give an opportunity to properly support or address the fact").  The Court is mindful, however, that "when drawing all reasonable inferences in favor of the non-movant the courts must disregard evidence the jury is not required to believe, including testimony of interested witnesses."  *Hill v. City of Scranton*, 411 F.3d 118, 129 n.16 (3d Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-51 (2000)).

[7] Saenz was part of the Merck Manufacturing Division Rotational Program, a two-year rotational development program for recent college and master's program graduates within the Merck Manufacturing Division.  Cooper Decl. ¶ 12 n.1 & Ex. A.

[8] According to Cooper, Matos also trained on the second shift with Matt Gehret, the Monday-to-Friday second shift supervisor, who had previously worked as the second shift weekend supervisor.  Cooper Decl. ¶ 12.  While Matos does not specifically dispute this, he identified only Saenz and Hoffman as his trainers.  *See* Matos Dep. 94.

training as a "blind leading the blind situation").  Because of the lack of adequate training, Matos

felt unprepared to assume the position of VFL supervisor.  *See id.* at 93-94 (recalling that on his

first day working as a supervisor, he was shaking so hard he was unable to sign his name straight

on his paperwork).  Despite being new to the VFL supervisor position, Matos was the only

supervisor on duty during his shift for his first few months on the job, until the other supervisor

on his shift returned from sick leave.  *See* Matos Statement ¶ 12; Matos Dep. 287.  In contrast,

the first and third shifts each had more than one supervisor.[9]  *See* Matos Statement ¶ 12; Matos

Dep. 79-80.  When working without a second supervisor, Matos would call Hoffman, the first

shift supervisor, if he had questions during his shift.  *See* Matos Dep. 97, 287.

On February 27, 2008, Cooper completed a 2007 year-end review for Matos.  Cooper

Decl. ¶ 13 & Ex. B.  Because Matos did not join Department 135 until late-September 2007 and

spent his first couple of months in the department training, the review covered Matos's

performance in November and December 2007 only.  Cooper Decl. Ex. B (listing the

performance period as November to December).  The review included both a "performance

dimension" rating, reflecting the reviewer's "evaluation of the employee's performance for their

combined effort on all of their objectives," and a narrative portion.  *Id.*  From the four available

ratings—"Delivered Below Objective," "Delivered On Objective," "Delivered Above

Objection," and "Delivered Significantly Above Objective"—Cooper rated Matos's performance

as "Delivered On Objective," indicating "100% demonstration of Performance Dimension."  *See*

---

[9] Although Matos testified that there were two supervisors on the third shift—a white man and a
white woman, *see* Matos Dep. 65-66, 79-80—it is not clear whether this was also the case on the
first shift.  Matos repeatedly identified Keith Hoffman, another white man, as the supervisor on
the first shift.  *See id.*  While Matos stated Hoffman had support from others on his shift,
including a woman named Grace, area head Justin Harrell, Cooper himself, and "whoever else he
had that could actually lend him a hand if he was in a jam," *id.* at 80, it is not clear whether there
was a second supervisor assigned to the first shift.

*id.* In the narrative portion of the review, Cooper stated Matos had made the transition from hourly to management ranks, had completed most of his initial training, and was starting to work independently, but stressed Matos's need for additional training, commenting:

> Ed's peer feedback indicates that he has much to learn about the VFL and that he asks a lot of questions. This is good because it is important that Ed understands what he does and does not know. He must ask questions whenever he is not absolutely sure of the possible outcomes of decisions that he must make. Ed must be aggressive with his training and spend as much time on the production floor as he can to gain the experience he needs.

*Id.* Based on the review, Matos was awarded a merit increase of 4%. *Id.* Cooper gave the completed year-end review to Matos, who signed the review in early-March 2008.

Later the same month, on March 31, 2008, a manager alerted Cooper that he had observed a Hazardous Energy Control Procedure (HECP) safety violation pertaining to the proper implementation of a lock out tag out (LOTO) protocol[10] in Department 135 during the first shift. Cooper Decl. ¶ 25. Operations management investigated the violation, assisted by the safety department and HR, and, after completing its investigation over the course of the ensuing eight weeks, issued a report which faulted all three shift supervisors involved in the LOTO at issue, including Matos, for failing to follow the applicable procedure. *Id.* ¶ 26 & Exs. D-F.[11]  On

---

[10] LOTO is a procedure in which personnel working on energized equipment take steps to "lock out" a piece of equipment while it is being worked on so as to ensure the equipment does not contain active energy such as gas, steam, or air pressure. Matos participated in LOTO operations throughout his employment at Merck. *See* Matos Dep. 114 (stating Matos "d[id] lockout/tagout every single day" during his time at Merck); Hannan Dep. 32 (stating Matos would have used a LOTO procedure "[p]retty much on a daily basis" while working for Hannan); Guellich Dep. 16-17 (stating Matos would have been trained yearly on Merck's specific LOTO rules and procedures). By Matos's own account, Merck regards LOTO violations by managers as serious infractions and such violations can result in termination. *See* Matos Dep. 136 ("[T]hat's the way it's done in Merck & Company, you do something wrong with the lockout/tagout, being in management, you will get fired.").

[11] In his answer to Merck's statement of undisputed facts, Matos denies that the incident report attributed any errors to him, arguing the report instead identified errors by only the third and first shift supervisors. Pl.'s Answer to Def.'s Statement of Undisputed Facts ¶¶ 41-42. In addition to

June 4, 2008, Cooper issued identical "Near Miss LOTO expectations" reprimands to the supervisor acting as the "appointed authorized employee" on each of the three shifts on which the violation occurred.[12]  *See id.* Exs. D-F.  The reprimands consisted of a May 25, 2008, cover memo from Cooper and a copy of the investigation report detailing the "multiple deviations" that occurred during the LOTO at issue.  The cover memo directed each of the supervisors to "[r]eview the near miss investigation and learn from it," noting a copy of the memo would be placed in their personal files and would impact their year-end appraisals, and also advising that "any subsequent lock out tag out incidents w[ould] result in discipline, up to and including termination."  *See id.*  The other two supervisors who received reprimands—both of whom are white men—are still employed by Merck.  By the time the investigation of LOTO incident was completed in May 2008, Matos was on short-term disability leave.  As a result, Matos was never given a copy of Cooper's reprimand or the investigation report on which the reprimand was based.

---

identifying errors by these supervisors, however, the report also indicates the second shift supervisor on March 30, 2008 (i.e., Matos) failed hold a "group lock out meeting to walk down the LOTO," Cooper Decl. Ex. D at MERCK 0041, which Matos concedes was an important part of the applicable procedure, *see* Matos Dep. 140-41 (explaining the reference in the report to a group lock out meeting "means that I have to show everybody that I locked out everything, everything is lock out, any safe, for them to work on and everybody agrees with it," and acknowledging that failure to fulfill this requirement could put others' lives in jeopardy). Although Matos disagrees with the statement in the report that there was no group lock out meeting "[b]ecause [he] would never have done that," *id.*, it is undisputed that the investigation concluded he failed to follow this procedure.  The incident report also notes that "[a]t the end of his shift, [Matos] removed his personal lock and applied a department lock (which happened to match the group locks used for each energy isolation device) during shift change prior to handing off to the next shift, his 3rd shift relief."  Cooper Decl. Ex. D at MERCK 0041.  Matos acknowledged it would be a problem for a department lock to match the group locks, *see* Matos Dep. 146, though it is not clear the extent to which the investigation faulted Matos for his choice of a department lock.

[12] Cooper also a formal reprimand to a first shift operator who failed to follow the applicable procedure.  Cooper Decl. ¶ 27.

In April 2008, apparently unaware that the LOTO investigation was ongoing, Matos saw his doctor because of the pressure and anxiety he was experiencing as a result of his inability to meet the demands of his job and his lack of pay.  *See* Matos Dep. 156-57, 165-66; Matos Statement ¶ 18.   Matos felt he was not performing his job adequately and attributed his difficulties to his lack of proper training.  *See* Matos Dep. 165-66.  Matos's doctor gave him a note directing him to take time off due to stress; the note excused Matos from work from April 14 to May 4, 2008.  *See id.* 157; Pl.'s Ex. S at MERCK 0429-30.

On April 14, 2008, Matos gave the doctor's note to Cooper, who told him to go to the health clinic.  *See* Matos Dep. 157-58.  Matos proceeded to the health clinic and met with a nurse, who gave him a packet of information that included a phone number to call to contact a psychologist, Family and Medical Leave Act paperwork, and a disability phone number to call. *See id.* at 158-59, 174-75; Pl.'s Ex. S at MERCK 0430.  After meeting with the nurse, Matos left work.  *See* Matos Dep. 159.  From April 14-30, 2008, Matos remained out of work based on his doctor's note.  On April 30, 2008, Matos was approved for short-term disability leave with an effective date of April 15, 2008.  *See* Pl.'s Ex. S at MERCK 0429.  Matos remained on leave until he resigned from Merck in October 2008.

By late-April 2008, after Matos began his doctor-approved leave, Cooper, who had come to believe that Matos was not making the progress necessary to succeed in his supervisory position, contacted HR seeking guidance as to how to address Matos's performance issues.  *See* Cooper Decl. ¶ 20; Pl.'s Ex. T.   Working in consultation with HR, Cooper prepared a Performance Expectations Memo (PEM) for Matos, outlining required improvements in six areas in which Matos was not meeting the expectations of his position.  *See* Cooper Decl. Ex. C.  The memo emphasized Cooper's "commit[ment] to helping [Matos] succeed" and contemplated that

8

the two would meet weekly to measure Matos's progress against the objectives stated therein. *Id.* at MERCK 0478.  The memo also advised that if Cooper's "discussions and coaching d[id] not result in an improvement in performance," Matos would be placed on a formal performance improvement plan.   *Id.* at MERCK 0478, 0481.  Because Matos never returned to work in Department 135, the PEM was never finalized or given to Matos.[13]

In June 2008, while on leave, Matos spoke with his disability case manager, Deborah Potts, RN, about the possibility of returning to work in his previous, non-management position. Potts told Matos he would have to return to work in order to look for a new job within the company, explaining "[w]e do not obtain new jobs while on STD [i.e., short-term disability]." *See* Pl.'s Ex. S at MERCK 0429; Pl.'s Answer to Def.'s Statement of Undisputed Facts ¶ 59. Matos recalled Potts telling him if he did not come back to work he would lose his job.  *See* Matos Dep. 179.[14]

---

[13] Cooper maintains he contacted HR about Matos's performance issues by the middle of March 2008 and advised Matos before he went on leave that the PEM was being prepared.  Cooper Decl. ¶¶ 20-21.  According to Julie Reed, an HR representative who worked with Cooper on Matos's performance issues, however, she first spoke with Cooper about Matos's deficiencies on April 28, 2008.  Pl.'s Ex. T.  Although Merck notes Reed's email does not necessarily establish when Cooper first spoke with the HR department (as opposed to Reed personally), there is no evidence that Cooper spoke with anyone in HR other than Reed about Matos.

[14] Matos also appears to have reached out to McGinn in June 2008 about the possibility of returning to his union position.  In an internal June 16, 2008, email, McGinn noted Matos had called him twelve days earlier to discuss his pay, including the fact he was not receiving the $900 shift premium McGinn had promised him.  *See* Pl.'s Ex. H.  According to the email, Matos also asked whether McGinn could help him get his bargaining unit job back.  McGinn responded that he could not, but told Matos he would convey Matos's question about getting his previous job back to HR and would also advise HR that he had quoted Matos a $900 shift premium during Matos's interview for the Department 290 position.

Case 2:13-cv-02648-JS   Document 60   Filed 03/03/15   Page 10 of 30

At some point during his leave, Matos also spoke with an HR representative about the possibility of returning to his former pipefitter position.[15]  *See* Matos Dep. 84-87, 181, 190-91. The person he spoke with, whose name Matos does not recall, told him there were no pipefitter positions available at the time and there was also no guarantee Matos would be offered a pipefitter position if one were available, as Merck had never brought anyone back from a management position to a union position.  *See id.*  Matos knew the assertion that Merck had never allowed an employee to go from a management position to a union position was incorrect and told the HR representative so, explaining he knew of a union instrument tech who took a management position, then came back as an hourly, union employee, and then returned to management.[16]  Matos Dep. 307.  The HR representative professed to have no recollection of the situation Matos described.

Matos did not pursue the issue further after speaking with the HR representative.  Instead, believing he would not be able to go back to work as a pipefitter, he began looking for other pipefitter positions, eventually obtaining a position at Schering-Plough in Summit, New Jersey, ninety miles from his home in Lansdale, Pennsylvania.  *See id.* at 190-91, 194; Matos Statement

---

[15] Matos understood the issue of whether he could return to his former position was an HR issue, not a disability issue.  *See* Pl.'s Answer to Def.'s Statement of Undisputed Facts ¶ 60.

[16] Tim Weinrich confirmed that, during his tenure with Merck, he (1) started in a union position as an instrument tech in 1996, (2) moved into a management position as a production supervisor in 2001, (3) returned to a position as an instrument tech in 2003, and (4) moved into a different management position as a mechanical services engineer in 2006.  *See* Pl.'s Ex. E (hereinafter Weinrich Dep.) 7-10, Mar. 13, 2014.  Weinrich moved from a management position back to a union position when his management position was eliminated.  *See id.* at 11-12.  Merck initially offered Weinrich another supervisory position, but he asked to interview for a then-open instrument tech position instead.  *See id.* at 12-13.

¶ 23.  Rather than remain out of work on long-term disability,[17] Matos accepted the pipefitter job at Schering-Plough.  On October 10, 2008, Matos went to Merck's West Point facility to tender his resignation.  *See* Matos Dep. 194.  When he arrived, he asked to see someone from HR, and a security guard told him the guard would call someone to come down.  *See id.* at 116.  After waiting for some period of time, Matos gave his badge and letter of resignation to the security guard and left.  *See id.*  In his resignation letter, addressed "To Whom It May Concern," Matos explained that he had accepted a position with another employer and expressed his appreciation for the "many learning and growth opportunities" he was given during his years at Merck.  *See* Def.'s Ex. 7.

In November 2009, Merck acquired Schering-Plough while Matos was still working there.  Both before and after the merger—in March-May 2009 and again in February-March 2010—Matos applied for nine different plumber/pipefitter positions with Merck, but was not hired for any of them.  According to Matos, at some point after the merger, he spoke with Jack Lee, a staffing consultant involved in the hiring process for the pipefitter positions, who told him because he had left Merck not too long ago, he would not have to take a test to be rehired.  *See* Matos Dep. 203.  Matos claims Lee told him it was "just a matter of communicating with one of the managers and, boom, it's a done deal."  *Id.*  When Matos did not hear back from Lee, he contacted Guellich, a higher-level supervisor in whose group Matos had worked on occasion.  By Matos's account, Guellich told Matos he had personally requested of HR that Matos come to

---

[17]  Before resigning his position with Merck, Matos learned his application for long-term disability benefits had been approved.  *See* Matos Dep. 117; Pl.'s Ex. S at MERCK 0428.

work for him as a pipefitter, but HR told him Matos "d[id]n't even stand a chance of getting an interview."[18]  Matos Dep. 128-29, 206.

On April 16, 2010, Matos submitted a written complaint of discrimination to Merck's Chief Ethics Officer.  Citing HR's statement to Guellich that he would not even be considered for an interview for a pipefitter position, Matos stated he believed Merck's refusal to rehire him as a pipefitter was discriminatory:

> As my former associates within Merck want my return to the pipefitter/plumber position, my work as a pipefitter/plumber was excellent, and there have been approximately eight open positions as a pipefitter/plumber within Merck since March, 2009, I am forced to conclude that there is no legitimate business reason as to why I cannot be hired as a pipefitter/plumber within Merck.
>
> Therefore, I believe I have been discriminated against on the basis of having a record of being disabled and/or my race/national origin as I was born in San Juan, Puerto Rico.

Pl.'s Ex. M.

Charles Brown from Merck's Office of Ethics investigated Matos's complaint.  As part of his investigation, Brown interviewed Matos, Lee, and Bob Dontonville, the "point manager" for applicants considered for the positions.  *See* Pl.'s Ex. I.  He also spoke and/or corresponded with Michelle Thrush and Julie Reed from HR.  According to Brown's case report, Lee told Brown that after receiving Matos's bids on the pipefitter positions, he asked managers who knew Matos to comment on his performance and on whether they were interested in interviewing him, but the managers advised Lee that "due to Manuel's previous behavior and performance in his previous jobs at Merck," they were not.  *See id.* at MERCK 0077, 0079.  Dontonville also told Brown he

---

[18] Guellich recalled speaking with Matos in 2010 when Matos called him to ask about open positions at Merck, but he did not recall ever asking Matos to apply for a job with him or telling Matos he would not be interviewed for pipefitter positions.  *See* Guellich Dep. 18-20, 31-33, 68. Matos also identified two other managers who he claims wanted him to come back to work at Merck, but there is no evidence either individual was part of—or made his or her preference known during—the hiring process.

"obtain[ed] verbal comments about Manuel['s] previous work experience from previous colleagues and management personnel," and because "[a]ll of the comments were negative," including about Matos's performance as a pipefitter, he did not select Matos for any interviews.[19] *See* Pl.'s Ex. I at MERCK 0077, 0079.   After investigating Matos's employment history with Merck, Thrush advised Brown that while a former manager told her Matos's performance was "OK as a pipe fitter," when Matos left Merck, he was about to be issued a PEM due to performance issues in his then-current position.  *See id.*  Thrush also stated former managers recalled that Matos had resigned by handing his resignation letter to a security guard rather than to management.  *See id.*  Thrush and Reed confirmed that "as a result of [his] previous performance concerns and the way [Matos] handled his resignation, he was not . . . being interviewed for new pipe fitter[] jobs."  *Id.* at MERCK 0077.  Consistent with Thrush's findings, Brown's case report reflects his conclusion that Matos "was not selected to be interviewed for new pipe fitter[] positions based on his previous performance issues and the way he left Merck previously."  *Id.* at MERCK 0078.

When Brown spoke with Matos at the conclusion of his investigation, Matos confirmed he had resigned from Merck by handing his resignation to a security guard and was having performance issues in the position he held at the time resigned.[20]  *Id.* at MERCK 0077-78.

---

[19] Brown's case report also indicates that Dontonville told Brown he had "worked with Human Resources previously concerning Manuel's performance issues," but does not indicate in what capacity.  Pl.'s Ex. I at MERCK 0077.  The only evidence of Dontonville's interactions with HR regarding Matos appears in Merck's response to the charge of discrimination Matos filed with the EEOC, which states that when filling the pipefitter positions for which Matos applied in 2009, Dontonville contacted HR to find out about Matos's past performance history and learned about his performance deficiencies in his supervisory position.  *See* Pl.'s Ex. L at MERCK 0004.

[20] Matos did not specifically recall discussing performance issues with Brown, but stated that if he did "it probably was the supervisor position because I don't remember having any

According to Matos, Brown advised him the reason he was not interviewed was because of the way he resigned and two documents in his file, including the reprimand regarding the LOTO incident.[21]  *See* Matos Dep. 114-16, 225-26, 231-32.  Matos contends his conversation with Brown in 2010 was the first time he learned about the LOTO violation.  *See id.* at 114-15.

In August 2010, Matos filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC), alleging he had been "discriminated against on the basis of [his] disability and/or race/national origin as well as retaliation."  *See* Pl.'s Ex. Q.  After the EEOC issued a notice of right to sue letter, Matos commenced this action.   In his four-count Complaint, Matos alleges Merck subjected him to disparate treatment in violation of Title VII, the ADA, and the PHRA by repeatedly denying him a plumber/pipefitter position because of his race, national origin, disability, and/or record of impairment.  Matos also asserts retaliation claims pursuant to each of the foregoing statutes and 42 U.S.C. § 1981, alleging Merck falsely accused him of safety violations and poor performance in retaliation for having filed internal and EEOC complaints.

In March 2014, Merck filed a motion for summary judgment as to all claims.  This Court thereafter granted Matos leave to take additional deposition discovery and allowed Merck to supplement its summary judgment motion based on the depositions.  After hearing argument on the motion at the final pretrial conference in May 2014, the Court continued the trial to permit further consideration of Merck's motion.

---

performance jobs on any other jobs."  Matos Dep. 228-29.  Matos then cited his 2007 year-end review as proof that Cooper did not believe he had any performance issues.  *Id.* at 229.

[21] Although Matos initially claimed Brown told him he was not rehired because of the way he resigned and his failure to complete a management course inapplicable to a union position, Pl.'s Ex. Q, at his deposition, he asserted Brown cited the way he resigned and performance concerns, including the LOTO incident.  *See* Matos Dep. 114-16, 225-26, 231-32.

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the defendant is the moving party, the defendant must "show that the plaintiff has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* (citation and internal quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (holding a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"; he must "come forward with specific facts showing that there is a *genuine issue for trial*" (citations and internal quotation marks omitted)).

A.    **Discrimination Claims**

Absent direct evidence of discrimination, claims of discrimination based on race, national

origin, and disability under Title VII, § 1981,[22] the ADA, and the PHRA are analyzed under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (Title VII, § 1981, and PHRA); *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995) (ADA). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *See Burton*, 707 F.3d at 426.  If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its action.  *See id.*  If the defendant satisfies this "relatively light" burden, the burden of production shifts back to the plaintiff to "provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.*

Merck argues summary judgment is warranted as to Matos's discrimination claims because Matos has failed to satisfy his burden at either the first or the third step of the *McDonnell Douglas* analysis.  To establish a prima facie case of race or national origin discrimination, a plaintiff must show

> (1) [he] belongs to a protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position.

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *see also Besko v. N.J. Juvenile Justice Comm'n*, 558 F. App'x 295, 298 (3d Cir. 2014) (characterizing *Sarullo* as articulating the elements of a prima facie case in a "typical failure-to-hire case arising under Title VII").  To meet his burden at this first step in the *McDonnell Douglas* analysis at the summary judgment

---

[22] Although Matos's § 1981 claim alleges only retaliation, the parties have treated the claim as alleging race and national origin discrimination as well.

stage, the plaintiff must present sufficient evidence "to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Burton*, 707 F.3d at 426 (citation omitted).

Merck concedes, for purposes of summary judgment only, that Matos can establish the first three elements of his prima facie case of race and national origin discrimination.  Merck argues, however, that Matos cannot establish the final element of his prima facie case because the circumstances surrounding the company's decision not to hire him for one of the available pipefitter positions in 2009 and 2010—the only adverse employment action challenged in this case—do not give rise to an inference of intentional discrimination based on race or national origin.

In his opposition to Merck's summary judgment motion, Matos argues he has established the final element of his prima facie case of race and national origin discrimination based on a host of circumstances giving rise to the required inference of discrimination, including (1) his last-minute reassignment to Department 135 after accepting a position in Department 290; (2) Merck's failure to pay him the $900 shift premium McGinn erroneously promised him, despite having previously honored a salary erroneously quoted to Guellich; (3) the failure to have two supervisors on the second shift, when both the first and third shifts had two supervisors; (4) his lack of adequate training; (5) Cooper's initiation of a PEM after Matos took medical leave; (6) allegedly differential treatment he received regarding "his disciplinary action" and "the initiation of a PEM"; and (7) a May 2010 email in which Michelle Thrush referred to him as "Manny Matos," rather than his proper first name (Manuel) or the name he actually uses (Ed or Eddie). *See* Pl.'s Opp'n 5-8.  Matos did not direct the Court to any record evidence regarding the race or national origin of the individuals ultimately hired for the pipefitter positions he sought.  During oral argument, however, Merck acknowledged the pipefitter positions were all filled by white

men with no prior Merck experience.  Matos thereafter argued for the first time that he could

establish the fourth element of his prima facie case on the basis that the applicants selected for

the pipefitter positions were outside the protected class.  The Court assumes for purposes of this

Memorandum that this showing is sufficient to establish the final element of Matos's prima facie

case of race and national origin discrimination.[23]

---

[23] Of course, Matos is not required to show the positions he sought were filled by persons outside
the protected class to establish a prima facie case. *See Pivirotto v. Innovative Sys., Inc.*, 191 F.3d
344, 347 (3d Cir. 1999).  But the other circumstances cited by Matos, without more, are
insufficient to support an inference of race- and national origin-based discrimination.

      Nothing in the record suggests Matos's reassignment or lack of training were in any way
related to his race or national origin.  The only evidence regarding the reassignment suggests
Matos was given the Department 135 position due to that department's greater business needs.
And while Matos maintains his training was wholly inadequate, there is no evidence anyone else
in his department received more or better training.  As to Cooper's initiation of a PEM, while
Matos has produced evidence from which a jury could find Cooper did not discuss the PEM with
HR until two weeks after Matos went on medical leave, Matos does not explain how the
proximity of the PEM to the start of this leave supports an inference of discrimination based on
race or national origin.

      Matos does attempt to cast the pay and staffing issues he identifies in racial terms, but the
evidence he cites does not support an inference of discriminatory action.  Matos contends
Merck's failure to honor the $900 shift premium McGinn erroneously promised him was
discriminatory because the company corrected a similar error for Guellich, a white manager.  By
Matos's own account, however, in his case, it was Cooper who would not approve the higher
shift premium because Department 135 "d[id] not pay that kind of money."  Matos Statement
¶ 8.  There is no evidence that Cooper ever honored an incorrect salary quote for any other
employee or that anyone in Department 135 was paid a higher second shift premium than the
$360 Matos received.  Cooper, who was "a level or two below" Guellich in Merck's hierarchy,
Guellich Dep. 25, was not involved in Guellich's pay dispute, which Guellich resolved only by
elevating the issue to a vice president, *see id.* at 61-63, something Matos admittedly did not do.
Given these differences in the circumstances surrounding Matos's and Guellich's pay issues,
including the different decisionmakers involved, there is no basis to conclude Cooper's failure to
honor the salary McGinn incorrectly quoted Matos was discriminatory.  As to staffing, while
Matos maintains his was the only shift without a second supervisor for his first few months in
Department 135, he also explained this was because the other second shift supervisor was on sick
leave, from which he eventually returned and "jumped back on the wagon."  *See* Matos Dep. 64-
65, 80, 287-89.  There is thus no basis to infer the lack of a second supervisor on Matos's shift
was discriminatory.

      Matos also asserts he was "not treated the same as others . . . regarding . . . his
disciplinary action, or the initiation of a PEM."  Pl.'s Opp'n 8.  Matos offers no evidence to
support his assertion that he was subject to disparate treatment based on the initiation of the

To establish a prima facie case of disability discrimination, a plaintiff must show he "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).  Merck again concedes, for purposes of summary judgment only, that Matos can establish the first two elements of his prima facie case of disability discrimination, but argues the circumstances surrounding the decision not to rehire him do not support an inference of intentional discrimination based on disability.  At oral argument, Matos asserted for the first time that he could establish the third element of his prima facie case of disability discrimination—i.e.,

_____

PEM.  As to the disciplinary action, the record reflects that Matos received the same reprimand as the other two supervisors involved in the LOTO incident.  While both of the other supervisors are still at Merck, there is no evidence either of them ever resigned from Merck and then sought to be rehired.  *See* Guellich Dep. 44 (stating a disciplinary action would not prohibit an employee from changing positions within Merck but would be a "red flag" for any hiring manager); Hannan Dep. 29 (acknowledging a disciplinary action could impact an employee's ability to transfer to another position within Merck).

Finally, Matos's reliance on Thrush's email also does not support an inference of discrimination based on race or national origin.  In the email, which was not written until May 2010, when Merck was investigating Matos's internal discrimination complaint months after the employment decisions he challenges were made in March-May 2009 and February-March 2010, Thrush asked a colleague, "Were you the one who told me to stay away from Manny Matos?  If it was you, do you remember why?"  Pl.'s Ex. V.  Matos argues this email is evidence of racial animus because Thrush referred to Matos as "Manny," which is neither his proper name nor his nickname, as he instead goes by Ed or Eddie.  The Court cannot agree.  While Thrush's use of a nickname for a fellow employee whom she did not know could be regarded overly familiar—and while it is undisputed the nickname Thrush used was incorrect—Manny is a common nickname for Manuel, Matos's proper first name.  Without more, Thrush's reference to Matos by this incorrect nickname cannot reasonably be construed as evidencing discriminatory animus toward Latinos or persons of Puerto Rican descent.  *See Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994) (holding a superior's practice of calling the plaintiff "Director" because he had difficulty pronouncing the plaintiff's Latino name might "reflect on [the superior's] insensitivity and unprofessionalism," but could not reasonably construed as evidencing his "bias against Puerto Ricans or Latinos, or to mean that [the superior] invidiously discriminated against [the plaintiff] because of his national origin").  In addition, Thrush's email does not suggest Merck's decision not to rehire Matos was tainted by race- or national origin-based discrimination because Thrush did not send the email until after the hiring decisions in question were made and there is no evidence Thrush had any involvement in the decisionmaking process beyond possibly providing Lee and Dontonville, the actual decisionmakers, with information about Matos's past performance history at Merck.  *See* Pl.'s Ex. L at MERCK 0004.

19

that he was not rehired as a pipefitter because of an actual or perceived disability—on the basis

that the positions were filled with persons outside of the protected class.  The evidentiary basis

for this argument is not clear, as Merck's representations regarding the individuals selected for

the pipefitter positions concerned only their race and lack of prior Merck work experience.

Nevertheless, the Court also assumes for purposes of this Memorandum that Matos can establish

a prima facie case of disability discrimination.[24]

---

[24] In his opposition, Matos argues he can establish the contested element of his prima facie case of disability discrimination based solely on emails Thrush exchanged with Merck colleagues in the course of investigating Matos's internal discrimination complaint.  The Court disagrees.

On May 12, 2010, Brown spoke with Thrush as part of his investigation of Matos's internal complaint.  On May 11, 2010, the day before her call with Brown, Thrush sent an email to Rob Malony, whose position within Merck is not identified, asking whether Malony was "the one who told [her] to stay away from Manny Matos," and, if so, why.  Pl.'s Ex. V at MERCK 0500.  Malony responded, "Boy I thought it was you who told me.  I was told (by somebody) that he became a staff mech services(??) or engineer in MRL (the old SOS???) and then 'struggled' in that position for a while then left the company.  I have it all 2nd hand at best."  *Id.* Thrush then forwarded her exchange with Malony to three other colleagues—William Flear, Robert Shine, and Nancy Ann Valaika—asking whether any of them recognized Matos.  *Id.* Shine, who apparently worked in Business Support/Maintenance and Utilities, responded, "All I know is that he was a 1st shift pipefitter who worked for Tom Hannan in the 44 Research shop and that he left the company."  *Id.*  Flear, whose position within Merck is not identified, responded that although he did not know Matos, he "asked around and heard he worked as a pipefitter in MRL, then moved to a management job in B62, went off the deep end – figuratively (nerves) and left the Company, possibly to Schering-Plough."  *Id.*  Matos argues Flear's comment that Matos "went off the deep end" reveals a perception within HR that Matos was crazy and Merck should therefore stay away from him.

The foregoing email exchange is highly unprofessional, and the Court agrees Flear's comment could reasonably be construed as conveying that some within Merck believed Matos had some sort of nervous condition before leaving the company.  Critically lacking from the record, however, is any evidence that Lee and Dontonville shared—or were even aware of—this perception when they declined to rehire Matos.  *See Sarullo*, 352 F.3d at 799 (holding a plaintiff had failed to establish a prima facie case of age discrimination where there was no evidence the person who declined to reinstate him knew his age).  Flear himself does not appear to have been aware of any issue Matos may have had until he "asked around" after receiving Thrush's email.  There is no evidence as to where within Merck Flear worked or who he asked about Matos, and the fact that Malony and Shine knew only some of Matos's prior positions, that he had struggled in one of his positions, and that he left the company cuts against any inference that the perception of Matos as "crazy" was widely shared.  As Matos's supervisor at the time he went on leave,

At the second step of the *McDonnell Douglas* analysis, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged employment action.  It is undisputed that Merck has satisfied its burden here, having produced evidence that Matos was not rehired because of deficiencies in his prior job performance, including his involvement in the March 2008 LOTO incident, and the abrupt, unprofessional manner in which he resigned.  *See* Pl.'s Ex. I; Matos Dep. 114-16, 225-26, 231-32; Pl.'s Answer to Def.'s Statement of Undisputed Facts ¶ 85.

Once the employer has satisfied its burden by articulating a legitimate reason for its unfavorable employment decision, the burden of production shifts back to the plaintiff to show that the employer's explanation is pretextual.  To make the required showing of pretext at the summary judgment stage, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  Although a plaintiff need not produce evidence "directly contradicting the defendant's proffered legitimate explanations," the evidence rebutting those explanations must be sufficient to "allow a factfinder reasonably to infer that *each* of the employer's proffered

---

Cooper presumably knew something about the reason for the leave, but there is no evidence Cooper regarded Matos as disabled a year or more later in 2009 and 2010.

Flear's email could also be construed as offering Matos's rumored nervous condition as a reason Thrush might want to "stay away" from him, but there is no evidence Thrush was aware of this condition—which Flear himself discovered only after making inquiry in response to Thrush's email—before receiving Flear's response.  Moreover, Thrush was not a decisionmaker with respect to the pipefitter jobs; the only evidence connecting her to the hiring process suggests her role, if any, was limited to providing Dontonville with information about Matos's past performance history.  *See* Pl.'s Ex. L at MERCK 0004.  The May 11, 2010, email chain initiated by Thrush thus cannot reasonably be construed as supporting the inference that Matos was not rehired because of an actual or perceived disability.

non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment decision." *Id.* (internal citation omitted).  It is not enough to show "that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765.  Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Matos primarily attempts to make the requisite showing of pretext by discrediting Merck's proffered reasons for not rehiring him.  As to the circumstances surrounding his resignation, Matos argues Merck's purported reliance on this justification is unworthy of belief because the company's own policies for employees on short-term disability leave expressly permit either the employee or the company to "terminate the employment relationship without notice at any time for any reason." Pl.'s Ex. F at MERCK 0371.  This argument misperceives the nature of Merck's complaint.  Merck does not argue—and has never argued—that Matos's resignation violated company policy.  Rather, Merck took issue with Matos's lack of professionalism and judgment in ending his nine-year tenure with the company by simply leaving his resignation letter and badge with a security guard, a course of conduct that did not go unnoticed by management.  *See* Pl.'s Ex. I at MERCK 0079 (noting Matos's former managers remembered that he "turned in his resignation to a security guard and never came back").  While Matos claims he attempted to resign in person but was unable to do so because no one from HR came down to the lobby to meet with him, he has produced no evidence that HR was expecting

him or even knew he was waiting, or that he was made to wait an unreasonable amount of time before he decided to leave.[25]   There is likewise no evidence that Matos made any effort to contact management about his plans before or after leaving his resignation letter with a security guard.   It was reasonable for Merck to regard the manner in which Matos resigned as unprofessional and to take this lack of professionalism into account in its hiring decisions. Matos has not shown that Merck's reliance on this factor in the hiring process is so implausible as to be unworthy of belief.

As to Merck's performance-based justification for not rehiring him, Matos first cites perceived inconsistencies in Merck's explanation of the performance issues that led the company not to rehire him, noting that Merck initially claimed he had performance problems as a pipefitter only to later concede his performance in that capacity was satisfactory.   Although inconsistencies in an employer's proffered reasons for an employment action "may be viewed as evidence tending to show pretext," such evidence must be "considered in light of the entire record." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001).   The record in this case does not reflect the kind of inconsistencies that would permit a reasonable factfinder to find Merck's performance-based justification for not rehiring Matos was pretextual.

When interviewed by Brown in May 2010, both Lee and Dontonville told Brown that Matos was not interviewed for the pipefitter positions because of negative feedback they received from managers and others familiar with Matos's prior work experience at Merck. Although Dontonville told Brown the people he spoke with "felt that [Matos] was not a good pipe fitter," Pl.'s Ex. I at MERCK 0077, nothing in the record suggests the feedback Dontonville and Lee received was limited to Matos's performance as a pipefitter.   To the contrary, Lee stated

---

[25] Matos could not say how long he waited, suggesting only that it would have been longer than six minutes.  *See* Matos Dep. 226-27.

the managers he spoke with told him they were not interested in interviewing Matos for the open positions "due to his previous behavior and performance in his previous jobs at Merck," and Dontonville, too, referred more generally to Matos's "previous performance issues and behavior." *Id.*  While there is no evidence in the record as to which of Matos's prior managers and colleagues Lee and Dontonville spoke to, there is evidence that Matos's performance as supervisor was discussed at management meetings.  *See* Guellich Dep. 25-26 (stating Guellich learned in talking with other managers that Matos "wasn't a good supervisor").  Moreover, Dontonville alluded to having worked with HR—which undisputedly was aware of Matos's performance problems in his supervisory position—regarding Matos's performance issues.

After interviewing Lee and Dontonville, Brown spoke with Thrush in HR, who told him that a former manager said Matos's "performance was OK as a pipefitter," Pl.'s Ex. I at MERCK 0079, but confirmed that (1) Matos had, in fact, experienced performance problems in the supervisory position he held prior to leaving Merck, as his then supervisor had been working with HR on a PEM for Matos, and (2) Matos's former managers recalled that when he left Merck, he turned his resignation letter in to a security guard rather than to management, and then never came back.  Brown also learned that Matos had been reprimanded for his role in the March 2008 LOTO incident.[26]  Based on the information he received from Lee, Dontonville, and Thrush, and after confirming at least some of this information with Matos, Brown concluded that Matos was not selected to be interviewed for the pipefitter positions because of "his previous performance issues and the way he left Merck previously."  Pl.'s Ex. I at MERCK 0078.  Since Brown completed his report, Merck has consistently cited Matos's performance deficiencies as a

---

[26] Although the LOTO reprimand is not specifically mentioned in Brown's case report, Matos repeatedly testified that Brown told him the reprimand was a reason he was not rehired.  *See* Matos Dep. 114-15, 225-26, 231-32.

supervisor and the abrupt and unprofessional way he resigned as reasons why he was not rehired. *See* Pl.'s Ex. L; Def.'s Mem. in Supp. of Mot. for Summ. J. 3-4.  Contrary to Matos's assertion, Brown's conclusion that Matos was not rehired because of his prior performance issues and the way he resigned is consistent with Lee's and Dontonville's explanation that Matos was not selected for an interview because of concerns managers had raised about his behavior and performance in his previous job at Merck.[27]

---

[27] There is no evidence as to whether Brown or anyone in HR pursued the issue of Matos's performance as a pipefitter further after learning from an unidentified former manager that Matos's work in this capacity was "OK" and learning that Matos did have performance issues as a supervisor.  Matos suggests Dontonville's account of having received negative feedback about his performance as a pipefitter is implausible, asserting Dontonville "claim[ed] to have intimate knowledge of Matos as a pipefitter" and to have "worked with HR about Matos['s] known performance deficiencies regarding same," notwithstanding that Matos never actually worked for Dontonville.  Pl.'s Opp'n 12.  The record does not support these assertions.  On the contrary, the record reflects that Dontonville solicited comments from people familiar with Matos's prior employment at Merck and received negative feedback, including about Matos's performance as a pipefitter.  While Lee characterized Dontonville as the manager "most aware of [Matos's] previous behavior and performance," Pl.'s Ex. I at MERCK 0077, there is no indication this awareness was based on anything other than the feedback Dontonville received from others.  Brown's case report also reflects that Dontonville told Brown he had previously worked with HR about Matos's performance issues, but there is no evidence Dontonville claimed such work concerned Matos's performance as a pipefitter or that he undertook it in a supervisory capacity.  Rather, the only evidence in the record regarding Dontonville's interactions with HR about Matos is that Dontonville contacted HR about Matos's performance history when filling the pipefitter positions and learned about his performance deficiencies as a supervisor.  *See* Pl.'s Ex. L at MERCK 0004.

Matos points to statements from Hannan and Guellich that his performance as a pipefitter was satisfactory.  *See* Hannan Dep. 18, 26 (stating Matos "worked fine for [Hannan] as a mechanic"); Guellich Dep. 33, 47 (characterizing Matos as "an average plumber/pipefitter" with an above average attitude and stating he "d[id]n't know of anybody who ever said anything bad about [Matos] . . . [a]s a plumber/pipefitter").  But neither Hannan nor Guellich recalls ever speaking with Dontonville about Matos's performance as a pipefitter.  And although Guellich wanted Matos to come back to work for him as a pipefitter, his characterization of Matos's skills as "average" hardly makes it implausible that another manager could have told Dontonville something different.  *Cf. Rahman v. Citterio U.S.A. Corp.*, 57 F. App'x 516, 518 (3d Cir. 2003) (noting a witness's letter describing the plaintiff's work as "ok" did not "blatantly contradict his later testimony that her work was 'below average'").  In any event, because there is no evidence the negative feedback Dontonville and Lee received about Matos was limited to his performance and behavior as a pipefitter, any issue regarding Matos's record as a pipefitter is insufficient to

Matos also seeks to discredit both the PEM and the reprimand regarding the May 2008 LOTO incident. As to the LOTO incident, Matos argues his receipt of a reprimand was substantively unwarranted because the investigation focused on the other two supervisors involved, and was procedurally improper because Cooper did not discuss the reprimand with him before placing it in his file. Matos also argues the approximately two-month delay between the safety incident and the completion of Merck's investigation of the incident is suggestive of an improper motive. None of these arguments has merit.

Contrary to Matos's assertion, the investigation of the March 2008 LOTO incident faulted all three supervisors involved in the LOTO at issue and specifically faulted Matos, who admittedly was the second shift supervisor on duty on the relevant date, for failing to hold a "group lock out meeting to walk down the LOTO." Cooper Decl. Ex. D at MERCK 0041. In his deposition, Matos conceded holding a group lock out meeting is part of the LOTO protocol and acknowledged failure to comply with this procedure could put others' lives in jeopardy. *See* Matos Dep. 140-41. Although Matos disagreed with the statement in the report that he failed to hold the required meeting on the basis that his practice was to comply with the protocol, he had no specific recollection of the March 30-31, 2008, procedure, and he has produced no evidence that he actually held the required meeting.

While Matos contends Cooper violated Merck policy by putting the LOTO reprimand into Matos's file without first discussing it with him, the only evidence he offers regarding this policy is Guellich's testimony that it was *his* policy—and, "as far as [he] kn[e]w," Merck's policy—"that you're supposed to discuss [a disciplinary action] with the person before you put it in the file." Guellich Dep. 42, 67. Guellich readily conceded, however, that he did not know

permit a reasonable jury to find Merck's reliance on his performance problems as a supervisor pretextual.

26

what the policy was if the employee was on leave when the disciplinary action was completed, *see id.* at 67-68, and in Matos's case, there was never an opportunity for Cooper to discuss the reprimand with Matos because Merck's investigation of the incident was not completed until after Matos went on leave and Matos never returned to work at Merck.

Matos offers no evidence to support his claim that the approximately two months it took to complete the investigation of the March 2008 LOTO incident was in any way unusual, apart from his own belief that such a serious safety violation "should have been addressed right away." Matos Dep. 132.  To the contrary, Guellich readily agreed it could take more than a month to get all the relevant facts together.  Guellich Dep. 41.  By Matos's own account, a LOTO violation by a manager is a serious infraction at Merck and could result in termination.  *See* Matos Dep. 136. Matos has failed to present any evidence that meaningfully undermines Merck's reliance on the LOTO reprimand as a reason why Matos was not rehired.

As to the PEM, Matos disputes that he had performance problems as a supervisor, citing the satisfactory performance review he received from Cooper in early-March 2008.  Matos also argues the timing of the PEM is suspicious as it was not until he began his stress-related medical leave that Cooper contacted HR about Matos's alleged performance issues.

While Matos now disavows any performance issues as a supervisor, in his deposition, he acknowledged that as of April 2008, he was struggling in his supervisory position.  By Matos's own account, at the time he took medical leave, he was unable to fulfill the demands of his job, *see* Matos Dep. 157, and felt he was "failing" and was not performing his job adequately, *see id.* at 165-66; *see also id.* at 102 (acknowledging there were tasks left undone on his shift). Consistent with Cooper's statement in the PEM itself that Matos had on multiple occasions "openly recognized [his] struggles to perform in [his] new supervisory role," Pl.'s Ex P at

MERCK 0438, Matos also agreed he had repeatedly told Cooper he was "having difficulties in completing [his] tasks," Matos Dep. 101.  Although Matos did not agree with all of the deficiencies identified in the PEM, he admitted there was a need for improvement in his batch record reviews and that he never acquired the access necessary to review and approve his employees' time.  *Id.* at 249-50; *see also id.* at 100-02.

Notwithstanding his own assessment of the difficulties he encountered in his new position, Matos argues a reasonable jury could find that Cooper's performance concerns were fabricated based on Matos's 2007 year-end review, in which Cooper rated his performance as "Delivered On Objective," and the fact that Cooper did not initiate the PEM process until after Matos began his medical leave.  The Court disagrees.  Although Matos did not receive his 2007 review until early-March 2008, it is undisputed that the review was limited to Matos's performance in November and December 2007, his first two months working as a supervisor.  Moreover, while Cooper gave Matos a satisfactory rating for the November-December 2007 time frame, nothing about the tenor of the review is inconsistent with Cooper's identification of deficiencies in Matos's performance three to four months later.  Indeed, the review noted the feedback from Matos's peers that he had "much to learn" about his new department and stressed that Matos needed to be "aggressive with his training and spend as much time on the production floor as he can to gain the experience he needs."  Cooper Decl. Ex. B.  The review thus fails to cast any meaningful doubt on the validity of the PEM.  Likewise, while the timing of an employment action in some circumstances may raise an inference that the employer's proffered reasons for the action were pretextual, *see Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 669 (3d Cir. 1999), there is no basis for such an inference here, given Matos's own testimony regarding the performance difficulties he was experiencing at the time he went on

medical leave.

Nor has Matos presented evidence from which a jury could reasonably believe "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.  Indeed, as set forth above, the facts to which Matos points as evidence of discrimination are insufficient to support an inference of discriminatory animus based on race, national origin, or disability.[28]  Because Matos has not pointed to evidence from which a reasonably jury could find Merck's proffered legitimate, nondiscriminatory reasons for the company's decision not to rehire him were pretextual, summary judgment is appropriate as to his race, national origin, and disability discrimination claims under Title VII, § 1981, the ADA, and the PHRA.

### B.    Retaliation Claims

In the absence of direct evidence of retaliation, claims of retaliation under Title VII, § 1981, the ADA, and the PHRA are subject to the same *McDonnell Douglas* burden shifting analysis as discrimination claims.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192-93 (3d Cir. 2015) (Title VII and PHRA); *Fenter v. Mondelez Global, LLC*, 574 F. App'x 213, 218 (3d Cir. 2014) (§ 1981); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.3 (3d Cir. 2004) (ADA).  To establish a prima facie claim of retaliation under any of these statutes, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection

---

[28] In addition to the evidence considered as part of his prima facie case, Matos offers an EEOC charge of race and national origin discrimination filed against Merck by an African-American manager of Haitian descent in June 2010.  *See* Pl.'s Ex. W.  This document does not alter the Court's pretext analysis.  Preliminarily, as an EEOC charge, the document contains only the complainant's allegations of discrimination.  Moreover, the complainant's allegations of discrimination by a manager in a different Merck department bear little resemblance to Matos's allegations in this case.

between the employee's protected activity and the employer's adverse action." *Williams*, 380 F.3d at 759 (citation omitted).

In his Complaint, Matos alleged Merck retaliated against him for filing internal and EEOC complaints by falsely accusing him of safety violations and poor performance. *See* Compl. ¶¶ 38, 41, 47. Matos abandoned this theory in his summary judgment briefing, and the record does not support it in any event, as there is uncontroverted evidence that both the LOTO reprimand accusing Matos of safety violations and the draft PEM identifying deficiencies in his performance were created in 2008, two years *before* Matos submitted his internal and EEOC complaints.

Matos instead seeks to pursue an ADA retaliation claim on the new theory that Merck's refusal to rehire him as a plumber/pipefitter was in retaliation for his taking short-term disability leave. Even assuming Matos could establish a prima facie case of retaliation, for the reasons set forth above, he has not produced evidence from which a jury could reasonably infer Merck's proffered reasons for not rehiring him are pretextual. Summary judgment is therefore appropriate as to Matos's retaliation claims as well.

For all of the foregoing reasons, Merck's motion for summary judgment will be granted. An appropriate order follows.

BY THE COURT:


      /s/ Juan R. Sánchez
Juan R. Sánchez, J.